### OSCAR L. DORR *vs.* INHABITANTS OF SHARON.

Norfolk.    November 15, 1907. — March 10, 1908.

Present: KNOWLTON, C. J., HAMMOND, LORING, BRALEY, & RUGG, JJ.

*Water Supply.    Sharon.    Damages,* For property taken under statutory authority.

Under St. 1905, c. 91, § 2, which authorized the town of Sharon to issue bonds securing a loan for the continuation of its waterworks, " provided that no source of water supply for domestic purposes shall be taken . . . without the consent of the State board of health," a taking by the town of Sharon, without first having obtained the consent of the State board of health thereto, of rights to withdraw water and of " all water rights " within a specified territory for the purpose of supplying to the inhabitants of the town water for domestic purposes is invalid.

The Sharon Water Company was authorized by St. 1883, c. 177, to take, by the use of certain specified formalities, " and hold the water of Lake Massapoag and the waters which flow into and from the same; Beaver Hole Meadow Brook and springs adjacent and tributary thereto, and also all lands . . . necessary for holding and preserving such water." The company made no taking, but bought some land on Beaver Hole Meadow Brook, placed a dam therein across the brook and over a natural spring, and erected a pumping station and a stand pipe connected with it. It also built a filter well on the land so purchased. Under the authority of St. 1894, c. 241, the town of Sharon in 1895 purchased from the company its franchise and all its corporate property and thereafter erected a larger pumping station on the land previously purchased by the company, drove four new tubular wells near the brook, and supplied its inhabitants with water from the filter well and the four tubular wells. In 1905, in accordance with the required formalities, the town filed in the registry of deeds an " instrument of taking " of land through which Beaver Hole Meadow Brook flowed " for the purpose of providing an increased water supply, . . . holding and preserving the same," and erected stone bounds about the tract so taken and executed acts of ownership over it. The owner of such land petitioned to have the damages suffered by him from the alleged taking assessed by a jury. *Held*, that St. 1883, c. 177, empowered the water company and its successor by purchase, the town, only to take land for holding and preserving water from the sources therein specified, and, until the town had made a taking of some of such waters, it could not take land to hold or preserve them; and that therefore its taking of the land in question was invalid.

PETITION, filed in the Superior Court for the county of Norfolk December 14, 1906, for the assessment by a jury of damages

caused to the petitioner by the alleged taking of certain land and water rights by the respondent for the purposes of its water supply.

The case was tried upon an agreed statement of facts before *Bishop*, J., who dismissed the petition, and the petitioner appealed.

The facts are stated in the opinion.

*J. A. McGeough*, for the petitioner.

*T. E. Grover*, for the respondent.

LORING, J.   This is a petition to recover compensation for a portion of a tract of two hundred and thirteen acres of land known as Beaver Hole Meadow, on the ground that the whole tract was taken by the water board of the defendant town on April 28, 1905.   This tract lies wholly south of Upland Road, formerly Depot Street, called on the plan annexed to the agreed statement of facts Moose Hill Road.

The only power of condemnation under which the tract here in question is alleged to have been taken was originally granted to the Sharon Water Company by St. 1883, c. 177, and passed to the defendant town through a purchase by the town in 1895 of the franchises and property of the water company under St. 1894, c. 241.

The power originally given to the water company by St. 1883, c. 177, was as follows: By § 1 the corporation is created " for the purpose of supplying the inhabitants of the towns of Sharon, Canton and Stoughton with water for the extinguishment of fires, and for domestic and other purposes."   Section 2 provides that " The said corporation, for the purposes aforesaid, may take, by purchase or otherwise, and hold, the water of Lake Massapoag, and the waters which flow into and from the same; Beaver Hole Meadow Brook and springs adjacent and tributary thereto, and also all lands, rights of way and easements, necessary for holding and preserving such water, and for conveying the same to any part of said towns of Sharon, Canton or Stoughton."   Section 3 provides that " said corporation shall, within sixty days after the taking of any lands, rights of way, water rights, water sources or easements as aforesaid, otherwise than by purchase, file and cause to be recorded, in the registry of deeds for the county within which such lands or other property is situated, a

description thereof sufficiently accurate for identification, with a statement of the purposes for which the same were taken." And § 4 provides that "said corporation shall pay all damages sustained by any person in property by the taking of any land, right of way, water, water source, water right or easement, or by any other thing done by said corporation under the authority of this act."

By the provisions of § 5 of St. 1894, c. 241, "All the authority granted to the said town by this act and not otherwise specifically provided for shall be vested in said board of water commissioners, who shall be subject however to such instructions, rules and regulations as said town may impose by its vote."

The water company never made a taking of the waters of either source of supply mentioned in its charter. What it did was this: In 1884 it bought two acres of land north of Upland Road, through which Beaver Hole Meadow Brook flowed. Beaver Hole Meadow Brook flows north through Beaver Hole Meadow (the tract of two hundred and thirteen acres here in question), under Upland Road, and through the two acres bought by the water company in 1884. On this two acres of land the water company maintained a dam across Beaver Hole Meadow Brook, and over a natural spring which was situated on the two acres erected a pumping station. Later it bought another tract of land on which it erected a stand pipe which it connected with the pumping station. As we understand the agreed facts, the water company also built a filter well on the two acre tract, and the water furnished by the defendant town, after its purchase from the corporation in 1895, came exclusively from this filter well and four tubular wells sunk by it. The exact statement on this point contained in the agreed facts is as follows: "The water of said Beaver Hole Meadow Brook and said natural spring were occasionally pumped through a condenser to the stand pipe mentioned, and since the year 1883 the said Sharon Water Company at times supplied the inhabitants with water thus procured. . . . Since the purchase of this property the town, by its water commissioners, has erected a new and larger pumping station on said lot, and has also caused four driven wells to be sunk on the same in

close proximity to said brook, in addition to a filter well.  The water for the use and supply of the town since the Sharon Water Company commenced operations, and to April 28, 1905, and up to 1901 and 1902, was obtained from a filter well.  An additional supply was obtained from four tubular wells on said land in some years.  The average amount of water used by the town is a little less than 100,000 gallons per day."

At a town meeting held on March 2, 1903, the following vote was passed: "That the town of Sharon authorizes its water commissioners to make a taking of water to the extent of five hundred thousand gallons per diem from whatever source the town is authorized to take the same."

In January, 1903, a committee consisting of the water board and four other citizens was appointed, and a similar committee was reappointed yearly until after the alleged taking here in question in 1905.  These committees seem to have been constantly at work.  They made yearly reports to town meetings of the defendant town.

At the town meeting on March 2, 1903, (the same meeting at which the vote to take a water supply not exceeding five hundred thousand gallons per diem was passed,) this committee reported that what was then necessary was to make investigations for finding an adequate water supply " at a considerable distance southerly from the present source of supply along the course of Beaver Hole Meadow Brook."  A similar committee was then appointed " with power to take whatever action may be necessary to furnish and maintain a pure and sufficient water supply for the town of Sharon and to bond such lands as in the opinion of this committee will be for the advantage of the town for this purpose, and to report at a subsequent town meeting."  A similar vote was passed at a town meeting held on March 16, 1903, by adjournment from March 2, 1903.  In their report to the town meeting held in March, 1904, this committee recommended: " The acquirement by purchase or condemnation proceedings of about twenty acres of land adjacent to that now owned by the town and under control of the water board," and the town voted: " that the same committee be continued with instructions and power to carry out the recommendations embodied in this report."  In its report made to a town meeting held on March 6, 1905, the com-

mittee said: " In view of the apparent impossibility of future progress on the lines of our last report, your committee recommends that it should be instructed by the town to further action, with additional powers to proceed with the purchase or condemnation of any land which in its opinion should be controlled by the town for the purpose of increasing and safeguarding its water supply." The town thereupon voted : " That the report of the committee be accepted and adopted, and that the same committee be continued with instructions and power to carry out the recommendations embodied in this report."

On April 28, 1905, the water commissioners entered upon and undertook to take the two hundred and thirteen acres of land here in question, by an instrument of taking dated June 26, 1905, which was " recorded with Norfolk deeds within sixty days after said taking."

This " instrument of taking " states that the town of Sharon " has within sixty days last past, to wit, on the twenty-eighth day of April, 1905, entered upon and taken, and deemed it necessary to take, for the purpose then and there declared, of providing an increased water supply for the town of Sharon, holding and preserving the same and conveying the water to the streets of said town, and does hereby take and hold for the use of said town of Sharon, and for the purposes aforesaid, all land situated within the boundaries hereinafter set forth, together with the right to withdraw water from all springs and subterranean waters in said land, also all water rights, rights of way, easements and privileges appurtenant thereto, also a right of way over, and the right to lay pipes and mains by and under, an ancient right of way from said land to South Main Street through the lands now or formerly of Henry P. Nawn and Mary A. O'Brien." Then follows a description of the two hundred and thirteen acres, a portion of which constitutes the parcels of land which are the subject of the petition for compensation now before us.

As we have said, Beaver Hole Meadow Brook flows through this land and under Upland Road to the two acres on which the pumping station of the town is situated.

At a town meeting held on January 10, 1906, the committee reported that the water board had taken formal possession of the

two hundred and thirteen acres here in question, and the town
voted to accept this report and discharge the committee.    Sub-
sequently the water commissioners, in their annual report printed
in the town book, referred to this taking, and the town voted " to
accept and adopt the reports of the several officers published in
the town book."

Since then the water commissioners have erected stone bounds
at the corners of said two hundred and thirteen acre tract, and
at the other points referred to in the "instrument of taking."
They have also driven wells at various points, and have taken
water from the wells for testing purposes.    Further, they have
put up signs forbidding trespassing on this two hundred and
thirteen acre tract, and have notified the petitioners and others
not to cut or remove any wood from said land.

The water board did not comply with R. L. c. 75, § 117, before
taking the two hundred and thirteen acres here in question.    On
January 1, 1906, the balance in the town treasury available for
use in its water department was $83.32.    " At that time the
entire amount, which the town was authorized under statute to
raise by the sale of its bonds and other species of indebtedness,
had been raised and expended, except the sums authorized by
the St. of 1905, c. 91, § 2."    What is authorized by St. 1905,
c. 91, § 2, is an issue of bonds not exceeding $20,000 in addition
to those authorized by St. 1905, c. 91, § 1.    The bonds author-
ized by § 1 were to be issued to retire the bonds originally issued
by the water company and assumed by the town when it bought
the franchises and property of the company in 1895.    The addi-
tional issue of $20,000 authorized by § 2 are to be issued for the
purpose of the original act (St. 1894, c. 241) and " for the further
extension and improvement of its water supply system," and is
made conditional on this: " That no source of water supply for
domestic purposes shall be taken under this act without the con-
sent of the State board of health, and that the location of all
drains, reservoirs and wells shall be subject to the approval of
said board."    The consent of the State board of health was not
obtained to the taking of the two hundred and thirteen acres
of land here in question.

. On December 4, 1905, (that is to say, over seven months after
the taking here in question,) the water board applied to the

State board of health "to view the lands so taken as shown upon the accompanying map, and to consent to the taking of water for domestic purposes from these lands, and to make such examination of said lands and the waters thereof as may be necessary to advise our board as to the acts necessary to insure the preservation and purity of such water supply." To this request the State board of health sent an answer dated January 4, 1906, the material portion of which was in these words: " The wells from which the water supply of Sharon is now being drawn proved inadequate for the supply of the town during the past summer, and it appears that an auxiliary supply has been obtained by drawing water directly from Beaver Hole Meadow Brook. In the communication addressed to your board under date of March 5, 1903, the State board of health expressed the opinion that this brook is an unsafe source from which to take water directly for drinking or other domestic purposes, and advised that tests be made with a view to obtaining an adequate supply of water for the town in the valley of the brook above the wells. In a subsequent communication, dated June 4, 1903, the board again advised that you make a test in the valley of Beaver Brook above your present wells to determine the practicability of obtaining an adequate supply of good water from the ground in this region. It appears that no tests have thus far been made in the region indicated or elsewhere, and the board has no means of determining definitely whether the necessary quantity of ground water can be obtained in this region or its probable quality. Under the circumstances the board is unable to advise you as to the protection of a water supply in this region or to consent at present to the taking of a supply here. The board would again advise that you make tests in the valley of the brook above your present wells, and when the results of investigations are available will give the matter further consideration."

On these facts the Superior Court dismissed the petition and entered judgment for the defendant, and the case is here on an appeal therefrom.

Apart from other possible objections, we are of opinion that the taking now before us was not valid as a taking of water because the consent of the State board of health had not been obtained as required by St. 1905, c. 91, § 2. See also R. L. c. 75, § 117.

The only power of condemning land which the water commissioners had in behalf of the defendant town was, in the words of the water company's charter, to take " all lands, rights of way and easements, necessary for holding and preserving such water, and for conveying the same to any part of said towns of Sharon, Canton or Stoughton." That means that, when a source of water supply had been acquired by purchase or otherwise, all lands necessary " for holding and preserving such water and for conveying the same " to the consumer could be taken.

We do not find it necessary to decide what effect is to be given to the words " and preserving" in the provision that all lands necessary " for holding and preserving such water" may be taken. Land for holding such water means land for a reservoir. It may be that land " for preserving such water " means land necessary to protect the water from impurity before it comes to the reservoir. If that is what is meant, it does not make the taking here in question a valid taking of land for two reasons: First, the power of condemning land " for preserving such water " was confined to the waters which the water company was authorized to acquire. Neither the water company nor the town ever acquired by purchase or otherwise any waters which it was authorized to take by St. 1883, c. 177. Second, passing that by, the town never had even used the waters of the brook. The water company has used them " occasionally," but the town used the water from the filter and tubular wells only. It follows that the taking here in question was not good as a taking of land.

*Judgment affirmed.*